**JUDD SUPPLY COMPANY, INC., et al., Respondents,**

v.

**MERCHANTS & MANUFACTURERS INSURANCE CO., Defendant,**

**City of Princeton, Minnesota, Appellant,**

**and**

**Varco–Pruden Buildings, a division of AMCA International Corporation, and Robert Essig, d/b/a Essig Construction Company, et al., Intervenors, Respondents.**

**CITY OF PRINCETON, Minnesota, Defendant and Third–Party Plaintiff,**

v.

**Howard BECKER, et al., Third–Party Defendants.**

**No. C5-89-507.**

Court of Appeals of Minnesota.

Dec. 12, 1989.

Review Denied Feb. 21, 1990.

James K. Sander, Wagner, Johnston & Falconer, Ltd., Minneapolis, for Judd Supply Co., Inc., et al.

Mark J. Heley, Laura J. Hanson, William M. Hart, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for City of Princeton, Minn.

Thomas P. Knapp, Jerry O. Relph, Hughes, Thoreen & Sullivan, St. Cloud, for Varco–Pruden Buildings, a div. of AMCA Intern. Corp.

Thomas L. Grundhoefer, League of Minnesota Cities, St. Paul, for amicus curiae, League of Minnesota Cities.

Heard, considered and decided by CRIPPEN, P.J., and NORTON and LOMMEN,* JJ.

## OPINION

NORTON, Judge.

The City of Princeton appeals a judgment awarding damages to former mechanics' lienholders who foreclosed against a privately-owned parcel developed in part through tax increment financing. We reverse.

## FACTS

This appeal arises after a tax increment financing-motivated construction project, begun within the City of Princeton in 1983, went awry. Appellant City of Princeton ("City") had published a tax increment finance plan and designated a Development District ("District") in accordance with Minn.Stat. ch. 472A (now replaced by Minn. Stat. ch. 469). Respondents either subcontracted or provided materials for the failed project.

Dickenson Bus Lines ("Dickenson") was planning a bus remanufacturing plant for another city but was persuaded to instead consider a parcel in the District. Dickenson was sold and the parent company, TU International, revived and expanded the project. Harold Becker formed and incorporated a construction company in order to become the developer of the project.

In early August, 1983, visible site improvement activity began, and Becker was receiving bids from subcontractors. It was subsequently established in a separate action that respondents' mechanics' liens attached at this time. No written agreements between Becker and the City or between Becker and TU or Dickenson had yet been executed.

The City intended to purchase the parcel for $100,000, and immediately sell the site to Becker for $1000 and write down $99,-000. Becker intended to enter into a purchase agreement with Dickenson, and to obtain construction financing for half the costs through a local bank, with the remaining costs supplied by Urban Development Action Grants (UDAGs). The City expected to completely recover the write-down within two years, through increased taxes, after which the tax base of the City would be permanently improved. When Becker was unable to obtain a letter of credit, the City decided to require a performance bond, substantially in the form of a bond under Minn.Stat. § 574.26, to protect its $99,000 writedown. Work continued throughout this period.

In September, a Land Development Agreement ("LDA") was executed by the City and Becker. The LDA provides for conveyance of the site and gives the City the right to reacquire the property if the project is not satisfactorily completed. At closing, the City purchased and then immediately conveyed the site to Becker. The two deeds and a construction financing mortgage were filed simultaneously the next day. The City owned the land for less than one minute.

In October, Becker and Dickenson executed a purchase agreement but Dickenson's obligations were contingent upon the availability of both UDAGs and industrial revenue bonds. The UDAGs were unavailable and Dickenson terminated the agreement; the site was without a purchaser.

Throughout this time, construction continued. On January 25, 1984, respondent Varco–Pruden filed the first mechanics' lien. Subcontractors and materials suppliers continued their work on the project; approximately thirty mechanics' liens were eventually filed against the property.

The validity of Becker's performance bond was disputed by the issuing company, which was subsequently liquidated. This action and a mechanics' lien foreclosure action were begun; this action was held in abeyance pending the foreclosure action, to which the City was not a party. In foreclosure the issue was that of priority be-

* Acting as judge of the Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 2.

tween the mechanics' liens and the construction financing mortgagee. The liens were held to have priority; Becker stipulated to the amounts of the liens. In April 1985, the court ordered foreclosure.

In June of 1985, the lienholders bid the full amounts of their liens and received title to the project. After the redemption period expired in 1986, the former lienholders alleged that the property was worth less than their bid, and this lawsuit was revived. The former lienholders sought and failed to recover on the bond, and sought recovery from the City, alleging a duty to provide a bond for their benefit as third-party beneficiaries of the LDA between Becker and the City, or that the project was a public work for which the City was required to provide a bond pursuant to Minn.Stat. § 574.26 (1988).

The issue of whether the project was a public work was reserved, without dispute, for the court as a matter of law; the issues of fact regarding whether damage occurred, the value of the property, and the issues of negligence and apportionment of fault were tried before a jury. The jury returned its verdict that the City and the lienholders were all negligent, some in excess of the negligence of the City. The court determined that the project was a public work and denied any reduction in damages resulting from the verdict of contributory negligence, which reduction would otherwise apply pursuant to Minn. Stat. § 604.01 (1988). Judgment was entered against the City.

## ISSUE

Did the trial court err in holding that the Dickenson project was a public work subject to the mandatory bond provisions of Minn.Stat. § 574.26?

## DECISION

This court is not bound by the trial court's conclusions as to matters of law. *A.J. Chromy Construction Co. v. Commercial Mechanical Services, Inc.*, 260 N.W.2d 579, 582 (Minn.1977). Words in a statute must be given their plain and ordinary meaning. Minn.Stat. § 645.08, subd. 1 (1988).

The trial court committed a fundamental error when it chose to ignore the plain meaning of the Economic Development statutes in reaching its conclusion that the Dickenson project was a traditional public work. Private development is not transformed into "public work" simply because it receives public financial assistance. Rather, in enacting this comprehensive series of tax increment financing statutes, the legislature created a new way to stimulate private economic growth. Therefore, the proper analysis begins, as did the Dickenson project, with the Municipal Industrial Development section of Minnesota Statutes ch. 469, Economic Development. This chapter governs tax base improvement through tax increment financing. Minn. Stat. § 469.152 is entitled "Purposes" and states in pertinent part:

> The welfare of the state requires the active promotion, attraction, encouragement, and development of economically sound industry and commerce through governmental action * * *

Minn.Stat. § 469.152 (1988). The City's plan parallels these statutes. Its stated objectives include creation of a major source of employment, expansion of the tax base and development and promotion of desirable industrial growth.

Section 469.153, "Definitions," defines "project" to include "any properties, real or personal, used or useful in connection with a revenue-producing enterprise, * * * engaged in * * * manufacturing." Minn. Stat. § 469.153, subd. 2 (1988). A bus remanufacturing plant satisfies this definition. A municipality has the power to acquire, construct, or hold any land, improvements, capital equipment, or inventory that is necessary in connection with a project to be situated within the state, and construct, improve, and extend the project. Minn. Stat. § 469.155, subd. 2 (1988). The City purchased the land for resale. Streets and utilities, easements and rights-of-way for rail service, a public incinerator and a district heating system were planned as public improvements.

Minn.Stat. § 469.105, subd. 6 entitled "Covenant running with the land" requires a deed for sale to incorporate a covenant relating to the conditions of use when a parcel is sold by an economic development authority to a developer for private development. The deed from the City to Becker incorporated the LDA, which gave the City substantial control over the site.

The powers conferred on municipalities are not absolute. *See, e.g.,* Minn.Stat. § 469.155, subd. 14, Limitations on powers (1988). A municipality is not authorized to expend tax increment funds for the acquisition, construction, renovation, operation or maintenance of public buildings. Minn. Stat. § 469.176, subd. 4g (1988).

Finally, a municipality may choose whether to waive or require a contractors' bond as described in Minn.Stat. § 574.26, regardless of whether the municipality is a party to the construction contract. Minn. Stat. § 469.155, subd. 16 (1988). This statute further provides that if a bond is required, then the provisions of Minn.Stat. ch. 514 (relating to mechanics' liens) are not applicable. On the other hand, if the bond is waived, then chapter 514 does apply to provide the foreclosure remedy. Minn.Stat. § 469.155, subd. 16 (1988).

Minnesota Statutes chapter 469, entitled Economic Development, indicates that substantial government involvement is authorized and expected to develop private industrial and/or commercial projects. The City's promotion of, assistance with, involvement in and supervision of the Dickenson project is contemplated and required by these statutes. The plan intended District land to be acquired and written down for private development, and prior to a resale the City was required to obtain a binding contract, performance bond and/or other guarantees to ensure that tax increments or other funds were available to repay the public cost. The plan's conformance with the Economic Development chapter is unchallenged.

The Dickenson project was a tax increment financed project pursuant to this chapter and, although the LDA did reference and require a performance bond, this requirement was for the sole benefit of the City to protect the $99,000 writedown. The mechanics' lien foreclosure action is mutually exclusive of, and precludes any requirement that, bond remedies or other damages be available to benefit the respondents. Minn.Stat. § 469.155, subd. 16 (1988). Furthermore, respondents' liens attached in August, well before the LDA was executed in mid-September.

The term "public work" in Minn.Stat. § 574.26, Contractors' Bonds, is undefined. This statute states in pertinent part:

[A] contract with the state, or with any municipal corporation or other public board or body thereof, for the doing of any public work, is not valid unless the contractor shall give bond to the state or other body contracted with * * *

Minn.Stat. § 574.26 (1988).

If this project had been a public work, chapter 514 remedies would not have been available. *See Burlington Manufacturing Co. v. Board of Courthouse and City Hall Commissioners,* 67 Minn. 327, 69 N.W. 1091 (1897) (mechanics' liens may not be foreclosed against a public project). The contractors' bonds statute protects subcontractors and materials suppliers who are barred from foreclosing their liens. The tax increment financing statutes permit a city the *option* of a section 574.26 bond in order to safeguard the land writedown investment. The existence of a bond affects only the remedies available, and does not transform a private project into a public work. The lienholders foreclosed on the property as a private parcel in an action to which the City was not a party. The project was developed pursuant to a statutory tax increment financing plan, and the purpose of the bond clause in the LDA is clearly to protect the City's writedown from Becker's failure to perform, not to create the liability and remedies of a mandatory statutory bond.

Amicus League of Minnesota Cities demonstrates that similar development activities occur throughout the state, from Frontier Equipment in Fergus Falls ($76,000 land writedown) to Carlson Center in Minnetonka and Plymouth ($14.85 million

in tax increment bonds) with many other projects between these two extremes. These projects are not even colorably public works. Public works are typified by sewer systems, streets and roads, schools and other projects owned and paid for by the government, exempt from property taxes and put to the common use. A private, commercial, industrial project is simply not the same kind of enterprise.

The legislative directive is clear that public involvement in tax increment financing is meant to promote private project development. Minn.Stat. § 469.152 (1988). Tax increment financing is a creature of the legislature; changes may only be made there. Because tax increment financing may only be used for private projects, the Dickenson project was not a public work. Thus, the bonding requirements of Minn. Stat. § 574.26 were not mandatory and did not compel the City to obtain a payment and performance bond for the benefit of subcontractors. Reference in the LDA to that section was solely to benefit the City. Because the project was not a public work, Minn.Stat. § 574.28 does not apply. The foreclosure action precludes the inference that the City elected the bond option to benefit subcontractors. The City is not liable for any damages arising out of this project. The other issues raised are neither reached nor decided.

Reversed.